FILED
IN OPEN COURT

FEB 13 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:12CR3 |
| | ) | |
| ANDRUS NOMM, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States of America and the defendant, ANDRUS NOMM, agree that were the United States to proceed to trial in this case, it would provide testimonial and documentary evidence to prove beyond a reasonable doubt that, from approximately January of 2007 through on or about January 19, 2012, NOMM did conspire and agree to commit an offense against the United States. Specifically, he knowingly conspired and agreed with others known and unknown to the government to willfully infringe copyrights by the distribution of works being prepared for commercial distribution and by making works available on a computer network accessible to members of the public, all for private financial gain. The purpose of the conspiracy was to violate the federal criminal copyright laws, including Title 17, United States Code, Section 506(a)(1)(A) & (C), and Title 18, United States Code, Section 2319(b)(1) & (d)(2). The evidence at trial would establish, at a minimum, the following facts:

1.  Beginning in approximately January of 2007 and continuing to at least on or about January 19, 2012, NOMM was a member of a group of individuals that created and operated a group of Internet websites, including, but not limited to, Megaupload.com, Megavideo.com, Megaclick.com, and Megaporn.com (collectively, the "Mega Sites").

Page 1 of 10

2.  Throughout that time period, NOMM worked with co-defendants KIM DOTCOM, MATHIAS ORTMANN, BRAM VAN DER KOLK, FINN BATATO, JULIUS BENCKO, and SVEN ECHTERNACH.

3.  DOTCOM was known to NOMM as KIM SCHMITZ or simply "Kim;" in fact, the first time he heard the name KIM DOTCOM was when he read the indictment in this matter. NOMM asserts DOTCOM made every important decision about the Mega Sites, including enforcement of the terms of service. DOTCOM also approved all outgoing wire payments. In NOMM's observation, DOTCOM did not care about protecting copyrights in the operation of the Mega Sites.

4.  ORTMANN was the Chief Technical Officer for the Mega Sites. He designed all of the technical aspects of the Mega Sites, including the infrastructure for how all the file servers communicated with the database and thumbnail servers. ORTMANN provided and maintained access credentials for employees. ORTMANN also authorized payments made through PayPal.com.

5.  VAN DER KOLK designed the web servers for the Mega Sites. He also had the responsibility for overseeing the response to copyright infringement notifications.

6.  BATATO was responsible for marketing and advertising sales through Megaclick.com.

7.  BENCKO was responsible for the website design of the Mega Sites.

8.  ECHTERNACH managed approximately 60 to 70 employees located in the Philippines. These individuals worked for the Mega Sites under the company Megateam. They were initially responsible for responding to customer emails and later for reviewing uploaded

videos for potential child pornography, bestiality, and terrorism-related content. ECHTERNACH was also in charge of providing the group with travel plans and plane tickets.

9. NOMM and each of the co-conspirators knew and discussed the fact that users often discovered copyright-infringing content stored on the Mega Sites through third-party linking sites.

10. Though NOMM was unaware of the total amounts of revenue the Mega Sites were generating, his co-conspirators were aware that they were making money directly from reproducing and distributing copyright-infringing content uploaded to the Mega Sites, including motion pictures, television programs, musical recordings, electronic books, images, video games, and computer software and some members of the conspiracy had full access to that content. In particular, NOMM was aware of millions of dollars being made through advertisements posted on the Mega Sites through Megaclick.com.

11. In 2007, DOTCOM paid for NOMM to travel to Manila, Philippines, to interview for a computer programming position with the website Megaupload.com. At the time, DOTCOM and VAN DER KOLK were also living in the Philippines. NOMM interviewed for and accepted the position. NOMM lived in the Philippines for approximately 11 months, after which he moved to Turkey after a dispute with DOTCOM. A few months later, NOMM returned to the Philippines where he continued to work for the group. Sometime thereafter, DOTCOM relocated the company from the Philippines to Hong Kong. It is NOMM's belief that DOTCOM was forced to move from the Philippines because of outstanding poker debts.

12. During that time period, NOMM's primary responsibilities were researching and programming video conversion techniques for the Mega Sites. DOTCOM paid NOMM € 2,000 per month. ORTMANN directly supervised NOMM's work and provided instructions on how to

create the architecture for the video conversion servers. The purpose of NOMM's work was to convert the video files into a format that allowed the Mega Sites to efficiently stream the file.

13. To help NOMM with the video conversion process, ORTMANN created a software tool that allowed NOMM to access every user-uploaded video on the Megaupload.com servers. NOMM used the tool to convert every compatible video stored on the Megaupload.com website into Flash and then make the video available on Megavideo.com and Megaporn.com. NOMM sent regular status updates to DOTCOM and ORTMANN.

14. When a user uploaded a file to Megaupload.com, the web server would send the file to a file server designated by a load-balancing algorithm designed by ORTMANN. Popular files would be reproduced and distributed across multiple different locations. The Mega Sites had file servers in Ashburn, Virginia, within the Eastern District of Virginia; Washington, DC; Canada; and the Netherlands. When a file was uploaded, the system would calculate a unique MD5 hash for the file. There was a theoretical possibility that two different files could have the same MD5 hash, but the chances were extremely small, and NOMM never saw that problem occur.

15. When a video file was uploaded by a user, the system automatically sent the file to NOMM for conversion. During the conversion, NOMM would extract thumbnail images from specific points in the video to be displayed when users accessed a preview of the video. These thumbnails images were stored on thumbnail servers.

16. Specifically, VAN DER KOLK used NOMM's video conversion tool to extract thumbnails and update metadata from files copied from YouTube.com. VAN DER KOLK told NOMM that DOTCOM wanted all the content from YouTube.com put into Megavideo.com.

17. In 2008, VAN DER KOLK became responsible for auditing content on any Mega Sites that featured publicly-displayed user-uploaded content, such as Megavideo.com, Megarotic.com, and Megaupload.com (but not Megaclick.com). VAN DER KOLK was supposed to supervise the auditing of the content, including for copyright infringement, child pornography, bestiality, and terrorism related content, in part by training the Megateam auditors located in the Philippines. NOMM was aware that the auditing for copyright was not very effective and that many of the auditors did not even know what copyright was. NOMM believed that communications between the Megateam and the policy makers were very limited.

18. In 2009, NOMM told ORTMANN that he could implement an automatic system for finding copyright-infringing files on Megavideo.com and flag them for review by an auditor. NOMM's automatic system would check the video files for watermarks and other indicators that were suggestive of copyrighted material. ORTMANN rejected the idea because it would prove that they had the ability to easily filter content on Megavideo.com.

19. In or about May of 2009, DOTCOM asked ORTMANN to provide top quality high-definition videos for the public-facing Megavideo.com homepage. ORTMANN used the video-querying tool to identify hundreds of videos, which he sent to NOMM for review. NOMM saw that many of the videos were copyrighted motion pictures and television shows.

20. VAN DER KOLK often received emails from users who complained about having technical difficulties watching videos on the Mega Sites. VAN DER KOLK often forwarded these emails to NOMM, who reviewed the videos for errors. Many of these videos depicted copyright-infringing content, such as motion pictures and television programs. NOMM found numerous files that were hosted on the Mega Sites contained the "FBI Anti-Piracy" warning.

NOMM specifically advised DOTCOM and ORTMANN about the legality of the files being hosted.

21. NOMM also worked on Megaclick.com, which sold advertising space on the Mega Sites. During the creation of Megaclick.com, DOTCOM promised that NOMM would receive shares of the company after it was completed. After the website was completed, however DOTCOM changed his position and refused to give NOMM any shares in the company. DOTCOM then promised that NOMM would receive a $1,000,000 bonus after the Mega Sites filed an initial public offering. According to DOTCOM, the Mega Sites were valued at $2 billion.

22. The database and web servers for Megaclick.com were hosted at Carpathia in Ashburn, Virginia, within the Eastern District of Virginia. NOMM designed the website's campaign pricing tool, which was based on Internet traffic, including visitor page views. NOMM designed real-time statistics for Megaclick.com to determine user traffic volume. In 2011, Megaclick.com had between 20 to 27 million unique users per day.

23. When NOMM received emails from Megaclick.com advertisers about copyright-infringing materials on the Mega Sites, NOMM forwarded those emails to VAN DER KOLK. NOMM received many emails from advertisers who wanted to cancel their advertising campaigns because of copyright-infringing content publicly available on the Mega Sites.

24. BATATO often received emails from advertisers who had technical questions about the Mega Sites. BATATO forwarded these emails to NOMM. For example, advertisers requested new ad types, such as audio or video ads, or asked to display their ads in different locations on the Mega Sites. At one point, BATATO and ORTMANN asked NOMM to place advertisements directly within videos that were displayed on the Mega Sites. NOMM determined whether these requests were technologically possible, and if enough advertisers requested a

change, NOMM communicate with VAN DER KOLK to accommodate the request. Such changes would have to be approved by DOTCOM.

25. DOTCOM personally negotiated with the largest Megaclick.com advertisers. BATATO dealt with advertisers and also supervised the salespeople who dealt with the other advertisers. When NOMM and BATATO disagreed whether an advertising campaign should be removed for violating the company's terms of service, ORTMANN would resolve the issue, with the ultimate authority being DOTCOM's.

26. In 2010 and 2011, DOTCOM paid NOMM more than € 100,000 for his work on the Mega Sites. These payments were made to NOMM at Account No. xxx-xxxxxx-833, Hong Kong and Shanghai Banking Corporation Limited. DOTCOM required NOMM to work 10 to 12 hours per day/7 days a week. NOMM was unaware of how much money the other co-conspirators were making, including DOTCOM, ORTMANN, and VAN DER KOLK. He was surprised when he saw the amounts in the indictment in this matter.

27. NOMM believed that DOTCOM frequently spent company money on personal expenses.

28. Megaupload.com had a "Top 100" file list. According to VAN DER KOLK, an employee was responsible for selecting which files were listed on the Top 100. The TOP 100 did not accurately list the top files, which would have been copyright-infringing content.

29. The Mega Sites offered both free and premium accounts. Free accounts had numerous restrictions. For example, the system slowed down the download speeds for free users. Also, free users were only permitted to watch up to 72 minutes of videos on Megavideo.com. ORTMANN programmed the 72-minute limitation on videos.

30. Premium users were eligible for the rewards program. The purpose of the rewards program was to incentivize users to upload popular content. The rewards program was shut down in 2011, because, NOMM believes, of concerns about copyright liability.

31. Third-party linking sites often bought premium accounts on the Mega Sites and shared the premium access with their users. These third-party linking sites specialized in copyright-infringing content, including motion pictures and television programs. The vast majority of the traffic on Megaupload.com and Megavideo.com came from third-party linking sites. NOMM and ORTMANN discussed blocking any third-party linking site that committed fraud on or endangered users of the Mega Sites, for example, by sharing a premium account or by containing malware. ORTMANN never mentioned blocking third-party linking sites for copyright-infringement.

32. NOMM personally downloaded copyright-infringing files from the Mega Sites.

33. NOMM was in custody as part of the United States' request to the authorities in the Netherlands for his arrest from January 21, 2012 through February 13, 2012. NOMM was taken into custody again on February 5, 2015 and has remained in custody since that time.

34. The acts taken by NOMM were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

35. This statement of facts includes those facts necessary to support the plea agreement between NOMM and the government. It does not include each and every fact known to the parties, and it is not intended to be a full enumeration of all of the facts surrounding the case.

36. This statement of facts shall be admissible as a knowing and voluntary confession in any proceeding against NOMM, regardless of whether the plea agreement is presented to, or

accepted by, a court. NOMM waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____
Jay V. Prabhu
Chief, Cybercrime Unit
Assistant United States Attorney

Date: 2/13/15

LESLIE R. CALDWELL
ASSISTANT ATTORNEY GENERAL

Ryan K. Dickey
Brian L. Levine
Senior Counsel
Computer Crime & Intellectual
    Property Section
Criminal Division
U.S. Department of Justice

**Defendant's Signature**: After consulting with my attorney, and pursuant to the plea agreement entered into this day between myself and the United States, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 2/13/15

_____
Andrus Nomm, Defendant

**Defense Counsel Signature**: I am counsel for the defendant in this case. I have carefully reviewed the above statement of facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: 2/13/15

_____
Alan H. Yamamoto
Counsel for the Defendant